**United States District Court**
**Southern District of Ohio**
**Eastern Division**

Paul M. Simmons,

       Plaintiff,

                                  **Case No. 2:04-cv-51**

   v.                             **Judge Smith**

                                   **Magistrate Judge Kemp**

Wal-Mart Associates, Inc., *et al.*,

       Defendants.

### OPINION AND ORDER

Plaintiff Paul M. Simmons brings the present action against his former employers, Wal-Mart Associates, Inc. and Wal-Mart Stores East, LP (collectively "Wal-Mart"), alleging numerous employment related claims.  Specifically, plaintiff asserts the following: (1) Retaliatory Discharge in violation of O.R.C. § 4123.90, (2) Tortious Wrongful Discharge in violation of Ohio public policy as established by O.R.C. § 4123.90, (3) Disability Discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (ADA), (4) Tortious Wrongful Discharge in violation of Ohio public policy as established by 42 U.S.C. § 12101, *et seq.*, (5) Disability Discrimination in violation of O.R.C. § 4112.01, *et seq.*, (6) Tortious Wrongful Discharge in violation of Ohio public policy as established by O.R.C. § 4112.01, *et seq.*, (7) Tortious Denial of Workers' Compensation Benefits, (8) Violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (FLSA), (9) Violation of O.R.C. § 4111.01, *et seq.*, (10) Fraud, and (11) Breach of Contract.  Defendant Wal-Mart moves for summary judgment on all claims (Doc. 26).  Plaintiff moves to strike the affidavit of Pamela Cowan (Doc. 43) and moves to certify questions of law to the Ohio Supreme Court (Doc. 48).  For the following reasons the Court **GRANTS** in part and **DENIES** in part defendant's motion for

summary judgment, **DENIES** plaintiff's motion to strike the affidavit of Pamela Cowan, and **DENIES** plaintiff's motion to certify questions to the Ohio Supreme Court.

## I. INTRODUCTION

### A. Parties

Plaintiff Paul M. Simmons resides in Ross County, Ohio.  Plaintiff worked for the defendant company at its distribution center located in Grove City, Ohio from 1996 to 2003.

Defendant Wal-Mart Associates, Inc. ("Wal-Mart Associates") is a Delaware corporation with its principal place of business in Bentonville, Arkansas.  Wal-Mart Associates is registered to do business in Ohio.

Defendant Wal-Mart Stores East, LP ("Wal-Mart Stores") is a Delaware limited partnership with its principal place of business in Bentonville, Arkansas.  Wal-Mart Stores is registered to do business in Ohio.  Wal-Mart Associates and Wal-Mart Stores will be collectively referred to as "Wal-Mart" or "Defendant" throughout the Court's opinion.

Defendant operates numerous retail stores throughout the United States.  Defendant owns and operates several distribution centers which receive merchandise from vendors and distribute that merchandise to defendant's store locations.  One of these distribution centers is located at 3880 Southwest Boulevard, Grove City, Ohio ("distribution center").

Defendant Wal-Mart is self-insured to provide benefits to its employees under the Ohio Workers' Compensation Act.  Defendant has been self-insured at all times since plaintiff first began his employment at the distribution center.  Defendant uses CompManagement as a third

2

party administrator for its workers' compensation claims.[1]

### B.  Facts

**1.  Workers' Compensation & Disability Discrimination Claims**

On February 12, 1996 plaintiff began working at defendant's distribution center as an unloader.  His primary job duty was unloading freight from tractor-trailers that were delivering merchandise to the distribution center.  On November 12, 1998 plaintiff injured himself while lifting freight at work.  Plaintiff informed his supervisor of the injury and later informed his managers, Phil Freeman and Matt Miller.  Plaintiff subsequently initiated his first workers' compensation claim for his injury.

Plaintiff's physician, Dr. Herbert Sinning, determined that plaintiff had suffered an inguinal hernia on his right side ("right hernia") as a result of his work injury.  Simmons had surgery to repair the hernia in December 1998.  Simmons returned to work the following week and advised his managers, Freeman and Miller, about each of the medications he was prescribed to take for post-operative pain and provided them the appropriate documentation.

In November 1999, plaintiff again injured himself at work, this time injuring his left side.  Shortly thereafter, defendant required plaintiff to undergo an independent medical examination in connection with the pain he was experiencing on his right side from his right hernia.  Dr. B.J. Pommerants conducted the examination and determined that Simmons had a left inguinal hernia ("left hernia") that also required surgical repair.  With regards to the pain plaintiff had been experiencing on his right side, Dr. Pommerants concluded that plaintiff suffered from "entrapped

---

[1] Prior to 2002, defendant used a company called "Claims Management" as its third party administrator. (Def. Mem. Supp. 4, n. 4.)  CompManagement became defendant's administrator sometime in 2002.  For simplicity purposes, the Court will refer to defendant's third party administrator as CompManagement.

nerves" as a result of his right hernia surgery.  Plaintiff then filed a second workers'
compensation claim, this time for treatment of his left hernia.

In January 2000, plaintiff had surgery to repair his left hernia.  Dr. Pommerants
instructed plaintiff not to perform any lifting at work for ninety days after the surgery.  When
plaintiff relayed this information to his managers, defendant instructed plaintiff to take a three
month leave of absence.  Plaintiff amended his initial workers' compensation claim to request
wage loss benefits in connection with his leave of absence.  Plaintiff eventually returned to work
in March 2000 and informed Miller of all medications he was prescribed to take for pain and
also provided Miller with the relevant supporting documentation for the medications.  Miller
then informed other Wal-Mart personnel about plaintiff's situation.

Over the next several months, plaintiff continued to experience constant pain in his left
and right groin area.  In mid-2000, Dr. Pommerants determined that Simmons had entrapped
nerves in connection with both his right and left hernias and told plaintiff that the nerves were
permanently damaged.  Plaintiff states that the pain from his condition is severe and continues to
this day.

Also in 2000, plaintiff sought a second opinion about ways to control the pain from his
entrapped nerves.  Upon Wal-Mart's recommendation, plaintiff saw Dr. Michael Orzo who
prescribed him pain medication.  The medications included Morphine, Celebrex, and Kadian.
According to plaintiff, none of these medications affect his ability to safely and effectively
perform his job functions at the distribution center.  Around April 2000, plaintiff informed Miller
about his condition and the medications he was taking.  Plaintiff's two workers' compensation
claims remained open because of his entrapped nerves.

To help alleviate plaintiff's pain, another one of plaintiff's physicians, Dr. Schulte, recommended plaintiff receive a test spinal stimulator.[2]  Defendant refused to approve the spinal stimulator both at that time and over the next two years.  As a result, plaintiff had to manage his pain using other pain treatments such as medications, nerve blocks, and a TENS unit.[3]

In 2001, on four separate occasions, defendant refused to  approve plaintiff's prescriptions for pain medication.  In response to plaintiff's inquiries, defendant informed plaintiff that the medications were not on its approved list or simply could not be approved.[4] Also in 2001, defendant refused to approve a TENS unit as recommended by Dr. Orzo and Dr. Rothstein.  Defendant ultimately approved the TENS unit one year later.

In 2002, defendant once again refused to approve plaintiff's pain medication prescriptions on four separate occasions.  Some of these were the same types of medications which defendant had previously approved, and defendant gave no explanation for the denial. Also in 2002, defendant refused to approve six nerve block treatments recommended by Dr. Schulte and Dr. Rothstein.  No explanation was given.  Finally, sometime in 2002 defendant's personnel manager, Karen Farley, attempted to persuade plaintiff to settle both of his open workers' compensation claims even though he was still receiving treatment.  Plaintiff refused to do so.

In January 2003, Joe Lawless became plaintiff's new Department Manager and one of

---

[2] A spinal stimulator is a pain alleviating device.  The purpose of the test unit is to see if plaintiff would be a good candidate for a permanent one.  (Simmons Dep. 128).

[3] A TENS unit sends a small electrical current to damaged nerves.  (Simmons Aff. ¶ 15).

[4] Defendant notes that approval was sometimes withheld until it received a new prescription form from plaintiff's doctor.  (Def. Mem. Supp. 5).

plaintiff's supervisors at the distribution center.  Shortly after Lawless began his new position,

he approached plaintiff and told him that Wal-Mart would make no special accommodations or

arrangements for him on account of his pain from nerve damage.  Lawless also told plaintiff that

he was expected to work in the same way other employees of the distribution center worked.

Defendant again refused to approve prescriptions on four occasions in 2003.  Some of

these medications had previously been approved in 2001 and 2002.  Further, in June 2003

defendant approved the test spinal stimulator upon the recommendation of Dr. Schulte, Dr.

Rothstein, and Dr. Orzo.  However, defendant subsequently withdrew its approval and ordered

an independent medical examination by another physician.  This fourth physician, Dr. McDaniel,

agreed with the other three and recommended the procedure.  Accordingly, defendant once again

approved the procedure in July 2003 and it was scheduled for August 8, 2003.  However, on

August 2, 2003 defendant again cancelled the procedure without explanation.  Two days later,

defendant terminated plaintiff's employment.  Lawless informed plaintiff he was being fired

because he was not able to do his job.  Defendant contends it fired plaintiff because plaintiff

falsified production reports.

Subsequent to plaintiff's termination, plaintiff's attorney insisted on defendant's approval

for the test procedure.  Defendant again approved it and plaintiff underwent the procedure on

August 28, 2003.  Based on the test unit's effectiveness, Dr. Orzo and Dr. Dixon agreed that

plaintiff would benefit from a permanent spinal stimulator.  However, defendant denied approval

of the permanent stimulator for the next six months.

Plaintiff indicates that he is in constant pain from his entrapped nerves and avoids certain

life activities because of his condition.  However, he does acknowledge that he is physically

capable of performing these life activities.  (Simmons Dep. 24-25).

### 2.  Plaintiff's Job Duties

Wal-Mart's distribution center is the location at which merchandise sold at regional Wal-Mart retail stores is first received.  Merchandise is unloaded from delivery trucks, processed, and in some cases, stored temporarily in the distribution center facility before being shipped to retail stores in the distribution center's region.  Defendant Wal-Mart employs "slotters" to process the unloaded merchandise.  This entails loading merchandise onto pallets, verifying the quantity of freight delivered, and assigning the merchandise to a particular location ("slot") in the distribution center.  The merchandise is then later retrieved by order fillers for shipment to Wal-Mart stores.

Among other things, plaintiff worked as a slotter at defendant's Grove City distribution center.  Wal-Mart required plaintiff to record the number of pallets he slotted on Slotter Production Sheets ("production sheets").  At the end of each shift, all slotters submit their completed production sheet to their supervisor.  Wal-Mart's performance standards require slotters to slot "staple stock freight" (freight stored in the distribution center on a long-term basis) at a rate of 32 pallets per hour, and "FID freight" (freight stored in the distribution center on a short-term basis) at a rate of 30 pallets per hour.  Defendant also has a Quality Assurance department that audits the pallets placed in each slot to ensure that they are slotted correctly.  This department issues Associate Performance Information Tracking Reports ("tracking reports") that reflect a slotter's accuracy in performing his or her duties.

In performing their duties, slotters use a handheld computer to scan bar code information associated with the merchandise they are slotting.  Upon scanning the bar coded information, the

7

slotter generates a label that is then affixed to the slotted freight.  In addition to generating a label, the act of scanning transmits information to the distribution center's computer system. The information can then be accessed on the computer's "goal screen."

### 3.  Plaintiff's Wage & Hour Claims

Plaintiff was an hourly paid employee throughout his employment with defendant.  As such, he was eligible to receive overtime pay.  Plaintiff, like all employees, was required to swipe his identification badge as a way of clocking in and out at the beginning and end of his shifts.  Plaintiff was additionally required to swipe out for his unpaid half-hour lunch break and to swipe in when he resumed work after lunch.  Therefore, plaintiff would typically have four swipes on his time card on any given day: in at the start of his shift; out for lunch; in after lunch; and out at the end of his shift.

Defendant's managers checked all employees' time sheets to ensure their accuracy.  If an employee's time sheet contained an error, the manager would correct it.  For example, if an employee failed to clock out for lunch when they had in fact taken a lunch break, a manager would adjust the employee's time downward.  Defendant utilizes two methods for adjusting time.  The first is to use a DC Time Adjustment Request ("time adjustment form").  The second method is to manually write on an employee's Daily Time and Attendance Report ("time report") in order to correct the recorded time.  Plaintiff's manager, Matt Miller, used both of these methods on several occasions to adjust plaintiff's time downward.  Defendant states that Miller regularly adjusted plaintiff's time downward for days in which he knew plaintiff had taken a lunch break but had failed to clock out for the half-hour.

Notwithstanding defendant's time-tracking system, plaintiff claims he worked off the

clock on several occasions between 1999 and 2003. This included working before clocking in for his shift, after clocking out for his shift, and working through his unpaid lunch break.[5] Plaintiff alleges he worked off the clock as follows: (1) approximately ninety-two times before clocking in for his shift, (2) approximately ninety-two times over his unpaid lunch break, and (3) approximately fifty-five to sixty times after clocking out at the end of his shift. (Simmons Dep. 157). Plaintiff claims he is entitled to compensation for all of his off the clock work.

## II. STANDARD OF REVIEW

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

---

[5] Plaintiff avers the work he performed over lunch either occurred after clocking out for lunch (off the clock) or it occurred on the clock for which plaintiff's supervisors later adjusted his time sheets so that they did not include those hours.

When reviewing a summary judgment motion, the court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).[6]  A court must disregard all evidence favorable to the moving party that a jury would not be required to believe.  Id.  Stated otherwise, a court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses.  Id.

Thus, the Sixth Circuit Court of Appeals has recognized that Liberty Lobby, Celotex, and Matsushita have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989).  The court in Street identified a number of important principles applicable to summary judgment practice as a result of this 'decided change.'  For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment.  Id. at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "'cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  Street, 886 F.2d at 1479 (quoting Liberty Lobby, 477 U.S. at 257).  The nonmoving party must adduce more than a scintilla of evidence to overcome the summary

---

[6] Reeves involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial motion for summary judgment under Fed. R. Civ. P. 56.  Nonetheless, the standards applying to both types of motion are substantially the same.  One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the court, having already heard the evidence admitted during trial, considers the record in its entirety.  Reeves, 530 U.S. at 150.  This stands in contrast to the procedure for deciding summary judgment in that a District Court will not have heard all the evidence.  Accordingly, the non-moving party has an affirmative duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact; a court need not comb the paper record for the benefit of the moving party.  In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).  As such, Reeves did not introduce a "heightened" standard of review for summary judgment motions.

10

judgment motion.  Id. at 1479.  It is not sufficient for the nonmoving party merely to "'show that there is some metaphysical doubt as to the material facts.'"  Id. at 1479 (quoting Matsushita, 475 U.S. at 586).  Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  Id. at 1479-80.  That is, the nonmoving party has an affirmative duty to direct a court's attention to those specific portions of the record upon which it seeks to rely in creating a genuine issue of material fact.  In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).

## III.  ANALYSIS

### A.  Disability Discrimination

Plaintiff asserts defendant Wal-Mart discriminated against him on the basis of a physical disability stemming from his two hernia surgeries in violation of both the ADA and O.R.C. § 4112.01, *et seq*.  Plaintiff also asserts two claims of tortious wrongful discharge in violation of Ohio public policy as established by the ADA and O.R.C. § 4112.01, *et seq*.  For the following reasons, the Court grants defendant's summary judgment motion with respect to these four claims.

**1.  Statutory Claims**

The ADA provides the following:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  The corresponding Ohio statute states:

11

> It shall be unlawful discriminatory practice: (A) For any employer, because of...disability...to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

O.R.C. § 4112.02(A).  The Ohio Supreme Court has endorsed the practice of looking to federal law interpreting the ADA for guidance on analyzing claims under Ohio's statute.  See Columbus Civ. Serv. Comm. v. McGlone, 82 Ohio St.3d 569, 573 (1998).  The Court will therefore analyze the two statutory claims together.

To establish a prima facie case of disability discrimination, a plaintiff must show that: (1) he is an individual with a disability within the meaning of the statute, (2) he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) his employer discharged him on account of his disability.  Walsh v. United Parcel Serv., 201 F.3d 718, 724 (6th Cir. 2000) (citing Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1177 (6th Cir. 1996)).  If a plaintiff establishes all three elements, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory explanation for terminating the plaintiff's employment.  See Monette, 90 F.3d at 1185-86.  The plaintiff is then required to establish that the proffered nondiscriminatory reason is a pretext for unlawful discrimination.  Id. at 1186.  However, under this scheme, "the plaintiff retains the ultimate burden of persuasion at all times."  Id. at 1186-87 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993)).  The relevant inquiries in the present case are whether plaintiff is disabled within the meaning of the statute and whether defendant's proffered nondiscriminatory reason for terminating plaintiff is a pretext for discrimination.

The ADA provides: "The term disability means, with respect to an individual – (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individuals; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).[7]  Therefore, "[s]ubsection (C) provides that having a disability includes 'being regarded as having...a physical or mental impairment that substantially limits one or more of the major life activities of such individual....'" Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999) (internal citations omitted).  To be "regarded as" disabled, a person must fall into one of two categories: (1) an employer must mistakenly believe that the person has a physical impairment that substantially limits one or more major life activities, or (2) an employer must mistakenly believe that an actual, nonlimiting impairment substantially limits one or more major life activities.  Id.

When the major life activity at issue is that of working, the statutory phrase "substantially limits" means the plaintiff is unable to work in a broad class of jobs as the result of a disability. Id. at 491.  In other words, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice."  Id. at 492; see also Cotter v. Ajilon Servs., Inc., 287 F.3d 593, 599 (6th Cir. 2002).  Thus, plaintiff must adduce evidence showing that defendant regarded him as having an impairment that rendered him unable to work in not only his then current position, but also in a broad class of positions.

In support of his claim that defendant regarded him as disabled, plaintiff points to two instances involving statements made by Mr. Lawless.  The first occurred in January 2003 when

---

[7] Plaintiff no longer alleges that he has an actual disability under section 12102(2)(A).  Rather, plaintiff claims that defendant regarded him as disabled under section 12102(2)(C).  Therefore, the Court will focus exclusively on the "regarded as" option for evaluating whether plaintiff has established the first prong of his prima facie case of disability discrimination.

Lawless became plaintiff's Department Manager. At that time, Lawless allegedly told plaintiff that he would make no special accommodations or arrangements for him because of plaintiff's nerve damage pain. (Simmons Dep. 38-40). He also allegedly told plaintiff that plaintiff was expected to perform in the same way that every other employee of the distribution center performs. Id. The second instance occurred at the time of plaintiff's termination when Lawless told plaintiff he was being discharged because he was unable to do his job. (Simmons Aff. ¶ 33). These statements are the only evidence plaintiff offers to show defendant Wal-Mart regarded him as disabled.

For purposes of the present motion, the Court will assume Lawless did in fact make the statements. Even so, the Court finds plaintiff has failed to adduce sufficient evidence to overcome summary judgment. Lawless' statement that plaintiff would receive no special accommodations and that he would be expected to work just like everyone else does not indicate that defendant regarded plaintiff as impaired and unable to work in a broad range of positions. In fact, the most logical inference is that defendant, while aware plaintiff was having some medical problems, did in fact believe plaintiff could perform his job duties without any sort of special treatment.[8] Furthermore, Lawless' statement regarding the reason for plaintiff's discharge also fails to demonstrate that defendant regarded plaintiff as disabled. There is no indication that plaintiff's medical condition had anything to do with Lawless' determination. Neither Lawless nor plaintiff made any reference to plaintiff's medical condition during their conversation. Indeed, there can be any number of reasons for an employee's inability to

---

[8] Even if the statement could be construed to mean Lawless believed plaintiff was unable to perform his job, it would still fall short of proving that defendant regarded plaintiff as unable to perform a broad class of jobs.

sufficiently perform their job duties.[9]  Lawless' general statement alone falls well short of

demonstrating that defendant Wal-Mart regarded plaintiff as unable to work in a broad range of

positions due to disability.  Cf. Ross v. Campbell Soup Co., 237 F.3d 701,703-07  (6th Cir. 2001)

(explaining how plaintiff had demonstrated genuine issues of material fact as to whether his

employer regarded him as disabled where: (1) employer had identified plaintiff as a "back case"

and a "problem person" in several company memos, (2) employer had told plaintiff "we can't

have any more of this back thing" during an evaluation, and (3) employer had spied on plaintiff

at his home in order to monitor his back injury); Senter v. Hillside Acres Nursing Ctr. of Willard,

Inc., 335 F.Supp.2d 836, 846 (N.D. Ohio 2004) (explaining how genuine issues of material fact

existed as to whether employer regarded plaintiff as disabled where plaintiff's supervisor told

plaintiff "you can't [return to work] because you need a sit down job and because of your

medical [condition].")

Because plaintiff has failed to adduce sufficient evidence to demonstrate Wal-Mart

regarded him as disabled, plaintiff has failed to establish a prima facie case of disability

discrimination and the Court finds it unnecessary to discuss pretext.  Therefore, the Court grants

defendant's motion for summary judgment on plaintiff's disability discrimination claims under

the ADA and O.R.C. § 4112.01, *et seq*.

**2.  Wrongful Discharge in Violation of Ohio Public Policy**

Since plaintiff has not adduced sufficient evidence to withstand summary judgment on

his two statutory claims of disability discrimination, his corresponding tort claims based on the

statutes' public policies must also fail.  See Ekstrom v. Cuyahoga Cty. Cmty. College, 779

---

[9] In the present case, defendant alleges plaintiff falsified his production reports and that this was the
problem with plaintiff's performance.

N.E.2d 1067, 1077 (Ohio Ct. App. 2002); <u>Cochran v. Columbia Gas of Ohio, Inc.</u>, 742 N.E.2d

734, 740 (Ohio Ct. App. 2000); <u>DeSanzo v. Titanium Metals Corp.</u>, 351 F. Supp.2d. 769, 782-83

(S.D. Ohio 2005).  Therefore, the Court grants defendant's motion for summary judgment on

plaintiff's claims for tortious wrongful discharge in violation of Ohio public policy.

### B.  Wage and Hour Claims

### 1.  Statutory Claims

Plaintiff asserts defendant Wal-Mart violated the FLSA and O.R.C. § 4111.01, *et seq.* by

failing to  pay plaintiff for all of the regular and overtime hours he worked.[10]  For the following

reasons, the Court grants defendant's motion for summary judgment on these claims.

The FLSA requires employers "to record, credit, and compensate employees for all of the

time which the employer requires or permits employees to work...."  <u>Tum v. Barber Foods, Inc.</u>,

360 F.3d 274, 279 (1st Cir. 2004).  The purpose of the FLSA is simply to guarantee that covered

employees are adequately compensated for all work they perform.  <u>Reich v. New York City</u>

<u>Transit Authority</u>, 45 F.3d 646, 648-49 (2nd Cir. 1995); <u>Tennessee Coal, Iron & R. Co. v.</u>

<u>Muscoda Local No. 123</u>, 321 U.S. 590, 602 (1944)).  The Act also entitles an employee to

"compensation for his employment in excess of [forty hours a week] at a rate not less than one

and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  That is, an

employee who works in excess of forty hours per week is entitled to receive one and one-half

their regular pay for each overtime hour they work.  Ohio's statute has an identical requirement.

<u>See</u> O.R.C. § 4111.03(A).  Putting this all together, an employee is statutorily entitled to

compensation for all hours worked, both regular and overtime.

---

[10] The Court will evaluate the federal and state claims together.

An employee who brings a claim under the FLSA for unpaid wages or unpaid overtime compensation has the burden of proving that he performed work for which he was not adequately compensated. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946). This burden is not to be treated as an impossible hurdle for the employee though. Id. at 687. Considering the fact that it is the employer who has the duty to keep records of wages and hours and the fact that employees seldom keep the records themselves, "a proper and fair standard [has been] erected for the employee to meet in carrying out his burden of proof." Id. With regards to this burden, the Supreme Court has stated the following:

> When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty....In such a situation we hold that *an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference*.

Id. at 687 (emphasis added).

The Court finds plaintiff has failed to adduce sufficient evidence to withstand summary judgment on his wage and hour claims. The only evidence plaintiff offers is his assertion that Wal-Mart required him to work off the clock in excess of 200 times for which he was never compensated. Plaintiff alleges he worked off the clock as follows: (1) approximately 92 times before clocking in for his shift, (2) approximately 92 times over his unpaid lunch break,[11] and (3)

---

[11] Plaintiff avers the work he performed over lunch either occurred after clocking out for lunch (off the clock) or it occurred on the clock for which plaintiff's supervisors later adjusted plaintiff's time sheets so that they did not include those hours.

approximately 55 to 60 times after clocking out at the end of his shift. (Simmons Dep. 157). However, plaintiff fails to support his assertions with any additional evidence. In fact, although plaintiff alleges he worked off the clock approximately 200 times since 1999, he fails to identify a single specific day on which this occurred. (Simmons Dep. 165-74). Plaintiff claims he kept a personal log of all hours he worked. However, he fails to offer these records into evidence so that a comparison could be made to the hours for which he was compensated. Plaintiff also fails to offer any paychecks or paystubs as evidence to show the amount of hours for which Wal-Mart actually compensated him. Further, plaintiff himself admits he never made a comparison of his personal log of hours to his pay stubs to see if Wal-Mart had underpaid him. (Simmons Dep. 206). Put simply, plaintiff's bald assertion that from 1999 to 2003 he worked off the clock over 200 times on unspecified days is not enough to create genuine issues of material fact as to whether he is owed any additional compensation.[12] Plaintiff has failed to produce sufficient evidence to show the amount and extent of his uncompensated work as a matter of "just and reasonable inference."

With regard to working through his lunch break, plaintiff claims his supervisor improperly altered plaintiff's records to reduce his compensation. In support of this allegation, plaintiff refers to several time adjustment forms filed by his supervisor. (Pl. Mem. Opp. at 37, fn. 39). Plaintiff also points to thirteen instances where his supervisor manually altered the hours on his time reports. (Pl. Mem. Opp. at 37, fn. 37). Defendant notes that this was common practice and that plaintiff's supervisors were merely correcting plaintiff's time where he neglected to clock out for lunch.

---

[12] This is especially true regarding plaintiff's claim for unpaid overtime wages since there is no specific information regarding when plaintiff worked more than forty hours in a week.

These records alone fail to create genuine issues of material fact.  Plaintiff has not provided evidence of his compensation for the days in which his time was adjusted.  He has also failed to establish that the days he allegedly worked through lunch were the same days in which his supervisors adjusted his time.  The very fact that Wal-Mart has a form designated for adjusting improperly recorded time implies that it is not a totally uncommon occurrence.  Thus, the use of these time adjustment mechanisms alone fails to establish a reasonable inference of unpaid wages or overtime compensation.

Therefore, plaintiff has failed to adduce sufficient evidence to withstand summary judgment on his claims under the FLSA and O.R.C. § 4111.01, *et seq.*  Accordingly, the Court grants defendant's summary judgment motion on these claims.

## 2.  Breach of Contract

Plaintiff asserts defendant breached plaintiff's employment contract by failing to pay him for all of his regular and overtime hours.  Plaintiff was an "at will" employee not covered by any written employment contract.  More importantly, the breach of contract claim is based on the same conduct alleged in plaintiff's wage and hour claims under the FLSA and O.R.C. § 4111.01, *et seq.*  Since this Court has found that no genuine issues of material fact exist with regard to plaintiff's statutory claims, his claim for breach of contract based on the identical alleged conduct must also fail.  Therefore, the Court grants defendant's motion on the breach of contract claim.

## 3.  Fraud

Plaintiff asserts defendant committed fraud by improperly adjusting plaintiff's work hours and underpaying him as a result. For the following reasons, the Court grants defendant's summary judgment motion on this claim.

To establish a claim of fraud, plaintiff must show: (1) defendant made a false representation of a material fact, (2) defendant made the representation with knowledge of its falsity, (3) defendant intended to mislead plaintiff into relying on it, (4) justifiable reliance by the plaintiff, and (5) injury proximately caused by the reliance. Chemical Bank of New York v. Neman, 52 Ohio St.3d 204, 208 (1990).

Plaintiff falls well short of creating genuine issues of material fact with regards to his fraud claim. Plaintiff alleges that his paychecks represented an understated amount of hours he worked and that this was fraudulent. However, plaintiff's claim is based on his assumption that he was not paid for the estimated number of times he worked off the clock. As previously discussed, plaintiff has failed to adduce sufficient evidence to support that allegation. Without more evidence, plaintiff cannot establish that defendant made a false assertion of material fact, and his fraud claim must fail as a matter of law. Therefore, the Court grants defendant's motion on the fraud claim.

### C. Workers Compensation Claims

### 1. Tortious Denial of Workers' Compensation Benefits

Plaintiff asserts defendant committed an intentional tort by the continual delay and selective denial, without explanation, of plaintiff's claims for workers' compensation benefits. For the following reasons, the Court grants defendant's motion on this claim.

The Ohio Supreme Court has recognized the claim of tortious denial of workers' compensation benefits.  See Balyint v. Arkansas Best Freight System, Inc., 480 N.E.2d 417 (Ohio 1985).  The plaintiff in Balyint had been injured at work and had begun receiving workers' compensation payments from his self-insured employer.  After two and one-half months of benefits, the employer abruptly ceased payments without obtaining approval from the Industrial Commission authorizing the termination.  The plaintiff brought a claim against his employer for tortious denial of workers' compensation benefits.  In response to the employer's assertion that Ohio law did not allow such a claim, the Court stated: "Accordingly, we hold that an employee of a self-insured employer may maintain a cause of action against the employer for the intentional and wrongful termination of workers' compensation payments."  Id. at 421.

Subsequent Ohio decisions have further defined the nature of this claim.  In Hall v. Marion Power Shovel, Inc., 603 N.E.2d 427 (Ohio Ct. App. 1992), the plaintiff brought a tort claim against his self-insured employer.  The claim arose from the employer's delay in approving a surgical procedure as well as a delay in restarting disability payments which had previously ceased.  Specifically, the plaintiff alleged that "his [workers' compensation] claims were unreasonably delayed, and that he suffered resulting financial ruin because of the defendants' lack of good faith in processing his claims."  Id. at 428.  In upholding summary judgment for the defendant, the Court relied on the fact that, unlike in Balyint, the employer had no legal duty to pay benefits to the plaintiff since the Industrial Commission had not ordered them to do so.  Id. at 431.  The lack of an Industrial Commission order meant that the employer had acted within the law.  Accordingly, there was no bad faith on the employer's part.  See also White v. Mount Carmel Med. Ctr., 780 N.E.2d 1054, 1069 (Ohio Ct. App. 2002) (explaining

how a self-insured employer did not act in bad faith since they had no legal duty to make payments to the plaintiff in the absence of an order from the Industrial Commission).

Finally, the Ohio Supreme Court again addressed this issue in Kokitka v. Ford Motor Co., 652 N.E.2d 671 (Ohio 1995).  That case involved a self-insured employer who had been ordered to make payments to an injured employee for a closed period of time.  After making all payments during the closed period, the employer ceased payments and the employee brought a claim for tortious denial of workers' compensation benefits.  In upholding summary judgment for the employer, the Court explained that "[n]o obligation to pay [plaintiff] for a second, separate period...ever arose, as no order to make such payments was ever made."  Id. at 676. Therefore, "unlike Balyint, the actions of the employer...were permitted by law and therefore do not rise to the level of bad faith."  Id.

These cases demonstrate that Ohio courts recognize claims of tortious denial of workers' compensation benefits in limited circumstances.  An employee can bring the claim only when a self-insured employer is under a legal duty to make payments and they fail to do so.[13]  In other words, an employer who continually delays claims or denies claims outright, and is under a legal duty to pay (for instance based on an Industrial Commission order), can be liable in tort for their bad faith.

In the present case, the Industrial Commission had not ordered defendant Wal-Mart to make workers' compensation payments to plaintiff.  In the absence of such an order, as well as

_____

[13]The claim has also been recognized where a self-insured employer fails to process a workers' compensation claim submitted to it by an employee and the employee is unable to personally file the claim because the limitations period has expired.  See Vandemark v. Southland Corp., 525 N.E.2d 1374 (Ohio 1988).  Although that case is further evidence of the existence of legitimate tortious denial of workers' compensation claims, the present case is factually distinguishable from Vandemark.

the absence of any other legal duty to pay, plaintiff's claim of tortious denial of workers'

compensation benefits must fail.  That being said, the Court acknowledges that defendant Wal-

Mart's actions with regards to its handling of plaintiff's claims certainly raises some concern.

Defendant continuously delayed and ultimately denied many of plaintiff's claims for prescribed

medications and surgical procedures.[14]  These measures were needed to alleviate pain from

plaintiff's entrapped nerve condition.  Oftentimes these delays occurred without explanation.

However, the state of Ohio has an administrative process for adjudicating these types of disputes

between self-insured employers and their employees.  See Ohio Adm. Code §§ 4121-3-13, 4121-

3-16.  Plaintiff should have sought redress within this administrative framework.

Although it appears plaintiff was treated poorly by defendant Wal-Mart, the Court is

without authority to grant plaintiff relief on his tort claim.  Therefore, the Court grants

defendant's motion on the tortious denial of workers' compensation claim.

## 2.  Retaliatory Discharge

Plaintiff asserts defendant discharged him in retaliation for pursuing workers'

compensation benefits in violation of O.R.C. § 4123.90.  For the following reasons, the Court

denies defendant's motion on this claim.

O.R.C. § 4123.90 provides, in pertinent part, the following with regards to retaliation:

No employer shall discharge, demote, reassign, or take any punitive action against
any employee because the employee filed a claim or instituted, pursued or
testified in any proceedings under the workers' compensation act for an injury or
occupational disease which occurred in the course of and arising out of his
employment with that employer.

---

[14] Some of the claims for medication which defendant denied were prescription medications which
defendant had previously approved.

To support a claim for retaliatory discharge, a plaintiff must show that (1) he engaged in a protected activity, (2) he was subject to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action.  White, 780 N.E.2d at 1063-64.  If a plaintiff meets this initial burden of establishing a prima facie case, then the burden shifts to the defendant to produce a legitimate nondiscriminatory reason for the adverse action.  Id. at 1064. Plaintiff then bears the burden of showing that the proffered reason is a mere pretext for discrimination.  Id.

In the present case, defendant concedes the first two elements and only disputes the existence of a causal link between plaintiff's pursuit of workers' compensation benefits (protected activity) and his termination (adverse employment action).  Defendant also avers that its proffered nondiscriminatory reason for plaintiff's termination is not a pretext for discrimination.  The Court will examine these two issues separately.

### a.  Causal Link

In support of its claim that no causal link exists, defendant focuses the Court's attention on the length of time between the dates plaintiff filed his workers' compensation claims, November 1998 (right hernia) and November 1999 (left hernia), and the date of plaintiff's termination, August 2003.  The length of time between the dates the claims were filed and plaintiff's termination is several years and does not raise a reasonable inference of retaliatory motive.  Defendant also focuses the Court's attention on the length of time between the date plaintiff originally filed his first request for a test spinal stimulator, sometime during 2000, and the date of plaintiff's termination, August 2003.  Again, the length of time between these events does not give rise to a reasonable inference of retaliatory motive.  However, defendant's focus

on these dates alone neglects the relevant events that occurred in the meantime.  Defendant's focus is simply too narrow.

It is true that the close proximity of the date an employee files a workers' compensation claim and the date of the employee's termination strengthens any inference of retaliatory motive. Boggs v. Conrad, No. 98CA120, 1999 WL 783952, *2 (Ohio Ct. App. Sep. 27, 1999).  Yet the Court is aware of no authority that states that close proximity of the date of filing and the date of adverse action is a requirement.  Although the lack of proximity can weaken the inference of retaliation, it does not necessarily prevent a claim from going forward.  Rather, the Court must examine all relevant events in its causation analysis.

Plaintiff's workers' compensation activities consisted of ongoing requests for various medical procedures and prescription medications, all of which had been recommended by various physicians.  In such a case, the reasonable approach to the proximity issue is to examine the proximity of plaintiff's termination to these significant events in addition to the initial filing. See Doss v. Hilltop Rental Co., No. C030129, 2003 WL 22269362, *7 (Ohio Ct. App. Oct. 3, 2003) (considering not only the proximity of the termination to the initial filing, but also the proximity of the termination to the employee telling her supervisor that her doctor had recommended additional surgery coupled with hostile responses from her supervisor).[15]

The following facts are largely undisputed by defendant.[16]  Plaintiff initially filed his workers' compensation claims in November 1998 and November 1999 after suffering injuries at

---

[15] From a public policy perspective this approach makes sense.  Otherwise, an employer would be free to retaliate against an employee for ongoing workers' compensation requests after a certain period of time had elapsed from the original date the employee filed his claim.

[16] Although defendant Wal-Mart does not dispute these facts, it does argue that any decisions made regarding plaintiff's requests for benefits are properly attributable to CompManagement, Wal-Mart's third party administrator.  Notwithstanding CompManagement's involvement, Wal-Mart is still liable for the handling of plaintiff's claims since CompManagement acted as Wal-Mart's agent.

work.  Plaintiff underwent two hernia surgeries as a result of his injuries.  In early 2000, Dr.

Pommerants diagnosed plaintiff with entrapped nerves from his left and right hernia surgeries

and informed plaintiff that the damage was permanent.  To this day, plaintiff suffers significant

pain from his condition.  Over the next several years, defendant delayed or outright refused to

approve various procedures and medications designed to alleviate plaintiff's pain.

 For example, during 2000 plaintiff requested a test spinal stimulator pursuant to Dr.

Schulte's recommendation.  Defendant refused to approve this procedure and further denied the

request over the next two or three years.  In 2001, on four separate occasions, defendant refused

to  approve plaintiff's prescriptions for pain medication.  In response to plaintiff's inquiries,

defendant merely informed plaintiff that the medications were not on its approved list or simply

could not be approved.  Also in 2001, defendant refused to approve a TENS unit as

recommended by Dr. Orzo and Dr. Rothstein.  Defendant ultimately approved it, albeit one year

later.

 In 2002, defendant's actions continued.  On four separate occasions, defendant refused to

approve plaintiff's pain medication prescriptions.  Some of these were the same types of

medications which defendant had previously approved, and defendant gave no explanation for

the denial.  Also in 2002, defendant refused to approve six nerve block treatments recommended

by Dr. Schulte and Dr. Rothstein.  No explanation was given.

 Finally, in late 2002 defendant's personnel manager, Karen Farley, attempted to persuade

plaintiff to settle both of his open workers' compensation claims even though he was still

receiving treatment.  As defendant's personnel manager, Ms. Farley acted as the point of contact

for plaintiff on all of his workers' compensation matters.  (Simmons Dep. 91).  Plaintiff had

previously spoken with Ms. Farley about his claims on numerous occasions.  (Simmons Dep.

90).  After plaintiff's second surgery in late 2002, Ms. Farley approached plaintiff in the front

break room and asked plaintiff to sign off on his workers' compensation claims.  (Simmons Dep.

93).  Plaintiff testified that "[t]hey had a form that she had received wanting to close my claims."

Id.  Plaintiff knew it was a Wal-Mart form because "[Wal-Mart] had their form identification.

They'll write a little WMW on the form.  So it was one of their forms."  (Simmons Dep. 94).

Plaintiff refused to sign the form since he was still experiencing pain from his entrapped nerves.

When plaintiff refused to sign the form, Ms. Farley left without giving plaintiff a copy.

In 2003, defendant again refused to approve prescriptions on four separate occasions.

Some of these had previously been approved in 2001 and 2002.  Further, in June 2003 defendant

finally approved the test spinal stimulator upon the recommendation of Dr. Schulte, Dr.

Rothstein, and Dr. Orzo.  However, defendant subsequently withdrew its approval and ordered

an independent medical examination.  This fourth physician, Dr. McDaniel, agreed with the

other three and recommended the procedure.  Thus, defendant once again approved the

procedure in July 2003 and it was scheduled for August 8, 2003.  However, On August 2, 2003

defendant again cancelled the procedure without explanation.  Two days later, defendant

terminated plaintiff's employment.

After plaintiff's termination, plaintiff's attorney insisted on defendant's approval for the

test procedure.  Defendant once again approved it, and plaintiff underwent the procedure on

August 28, 2003.  Based on its effectiveness, Dr. Orzo and Dr. Dixon agreed that plaintiff would

benefit from a permanent spinal stimulator.  However, defendant denied approval of this

procedure for another six months.

27

The fact that defendant continually delayed and denied plaintiff's various requests for benefits, coupled with defendant's attempt to pressure plaintiff into settling his outstanding claims, leads this Court to conclude that plaintiff has satisfied the causal link element of his prima facie case.  Several of plaintiff's requests for benefits occurred around the time of his termination.  For example, two of the instances where defendant denied plaintiff's prescriptions occurred in 2003 before plaintiff's termination.  Also, defendant's approval, followed by its refusal, followed by its approval, followed by its refusal to allow the test spinal stimulator surgery occurred in June, July, and August of 2003.

But beyond the proximity issue, the frequency and general nature of defendant's handling of plaintiff's requests, coupled with defendant's express desire for plaintiff to close his two claims, leads the Court to believe that plaintiff's requests for benefits had something to do with his termination.  Therefore, the Court finds plaintiff has established a causal link.

### b.  Pretext

As a preliminary matter, the Court will consider plaintiff's motion to strike the affidavit of Pamela Cowen (Doc. 43).  Defendant offers Ms. Cowan's affidavit ("Cowan affidavit") in support of its proffered nondiscriminatory reason for terminating plaintiff.  For the following reasons, the Court denies plaintiff's motion.

Defendant failed to disclose Ms. Cowan as a potential witness in its initial Rule 26 disclosure and failed to identify Ms. Cowan in any supplemental disclosures.  The Federal Rules clearly lay out a remedy for violations of Rule 26:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed. R. Civ. P. 37(c)(1).  Therefore, defendant will not be permitted to rely on the Cowan affidavit unless its failure to disclose Ms. Cowan was either justified or harmless.

Defendant argues its failure to disclose Ms. Cowan was justified since it had no way of anticipating that plaintiff would discuss the quality assurance issue in his memorandum in opposition to defendant's motion for summary judgment.  Although this is a close issue, the Court will give defendant the benefit of the doubt as the nonmoving party.  The Court is somewhat doubtful as to defendant's supposed inability to anticipate plaintiff's discussion of the Quality Assurance department with regards to pretext.  However, as discussed *infra*, the Court finds plaintiff has adduced sufficient evidence to overcome summary judgment on the retaliatory discharge and public policy claims anyway.  For these reasons, the Court denies plaintiff's motion.

Defendant Wal-Mart's proffered nondiscriminatory reason for terminating plaintiff is that plaintiff falsified production reports.  Plaintiff asserts this reason is a pretext for retaliation.

After a defendant has met its burden of articulating a legitimate, nondiscriminatory reason for the adverse action, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation."  Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1083 (6th Cir. 1994).  A plaintiff can refute the employer's nondiscriminatory reason "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).  The plaintiff bears the burden of showing that the defendant's proffered reason is pretextual.  Id. (citing McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)).  In the present case, plaintiff avers that defendant's nondiscriminatory reason is untrue and thus has no basis in fact.

As stated previously, slotters such as plaintiff are required to log their own production on production sheets.  Defendant Wal-Mart uses these production sheets to track the slotter's productivity.  Defendant states that in late July 2003, plaintiff's supervisor became aware of a possible discrepancy between the number of pallets plaintiff reported to have slotted and the number of pallets actually slotted.  A comparison of plaintiff's production sheets to the goal screens for July 27, July 28, and August 2, 2003, allegedly showed that plaintiff had overstated production by more than 200 pallets.

In support of his argument that the alleged discrepancy is a pretext, plaintiff notes that the information on the goal screens does not display the number of pallets actually slotted for a given day.  Rather, the screens show the number of cases for each purchase order received.  Typically, one case represents more than one pallet.  Thus, the goal screens would not have indicated the number of pallets Simmons actually slotted for the three dates in question.[17]  Plaintiff further notes that defendant's Quality Assurance department conducts daily audits to ensure that all freight is slotted correctly and placed in the appropriate place.  The department then issues tracking reports reflecting an employee's accuracy in slotting pallets that were reported on the employee's production sheets.  On July 28, 2003, one of the three days in question, Quality Assurance determined that plaintiff had an accuracy rating of 100 percent with regards to the pallets he had slotted that day.

---

[17] Plaintiff also indicates that no printouts were made of the goal screens for the days in question, thus rendering any verification of defendant's discrepancy allegations impossible.

Finally, plaintiff highlights the events surrounding his termination as further evidence of pretext. On August 4, 2003 Lawless conducted a standard exit interview with plaintiff. During the interview, plaintiff was shown an exit interview form which contained information regarding his termination. Lawless did not tell plaintiff about the falsification allegations at this time and the interview form did not contain this reason for his termination. Upon discovering the falsification allegations in late August 2003, plaintiff requested a copy of his exit interview form and noticed that it was different than the form originally shown to him at his interview. An important difference was that the new form contained the falsification allegations as the reason for his termination. Essentially, plaintiff claims that the exit interview form was changed after his interview. Lawless' deposition testimony supports the possibility of this occurring. (Lawless Dep. 131-32).

In response to plaintiff's arguments, defendant Wal-Mart contends that the Quality Assurance audits do not actually verify the accuracy of the employee's self reporting. Defendant also disputes plaintiff's analysis of the goal screens as well as the significance of any changes in the exit interview form.

After considering the evidence, the Court finds plaintiff has satisfied his burden of proving that plaintiff's nondiscriminatory reason is a pretext for retaliation. The amount of evidence plaintiff has adduced sufficiently undermines the alleged falsification of his production reports.

In conclusion, plaintiff has established a prima facie case of retaliatory discharge and has demonstrated that genuine issues of material fact exist as to the actual reason for his termination.

For all of the foregoing reasons, the Court denies defendant's motion for summary judgment on the retaliatory discharge claim.

### 3.  Wrongful Discharge in Violation of Public Policy

#### a.  Motion to Certify

As a preliminary matter, plaintiff moves the Court (Doc. 48) to certify the following question of law to the Ohio Supreme Court: Does Ohio law recognize a common law tort claim for wrongful discharge in violation of the public policy embodied in R.C. § 4123.90?[18]  For the following reasons, the Court denies plaintiff's motion.

> The Ohio Supreme Court Rule of Practice XVIII states the following:
>
> The Supreme Court may answer a question of law certified to it by a court of the United States.  This rule may be invoked when the certifying court, in a proceeding before it, determines there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent in the decisions of this Supreme Court, and issues a certification order.

Two requirements exist under the rule: (1) the question of Ohio law must be determinative of the proceeding, and (2) there must be no controlling Ohio Supreme Court precedent on the issue. The Sixth Circuit has held that "use of the certification procedure is most appropriate when the question of state law is new or state law is unsettled."  Transamerica Ins. Co. v. Duro Bag Mfg. Co., 50 F.3d 370, 372 (6th Cir. 1995).  However, the decision to certify a question of state law to a state supreme court is within the district court's discretion.  Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974).

---

[18] Plaintiff filed the motion as a motion to certify the question of law to the Ohio Supreme Court.  Since there is already a case pending before the Ohio Supreme Court, Sidenstricker v. Miller Pavement Maintenance, Inc., Ohio Sup. Court Case No. 04-1739, which allegedly will decide this issue, and since that case is the basis for plaintiff's desire to certify the question, plaintiff is actually seeking a stay of the present case pending the outcome of Sidenstricker.

Based on the existing case law, the Court is satisfied that this issue is not a properly certifiable one.  Recently, judges in both the Northern and Southern Districts of Ohio have ruled that a public policy claim is embodied in § 4123.90.  See Hall v. ITT Automotive, 362 F.Supp.2d 952, 963 (N.D. Ohio 2005); Welty v. Honda of America Mfg., Inc., No. 2:05-CV-60, 2005 WL 1334923, at * 9 (S.D. Ohio June 6, 2005).  Although in  Jakischa v. Central Parcel Express, No. 03-3976, 2004 WL 1987131, at *3  (6th Cir. Sept. 1, 2004), the Sixth Circuit held that there is not a public policy claim embodied in § 4123.90, the Hall and Welty courts reasoned that they were not bound by this unpublished opinion.  Hall, 362 F.Supp.2d at 963; Welty, 2005 WL 1334923, at *9.  The Hall court stated that it "may not disregard the half-dozen Ohio appellate cases . . . holding that [tortious wrongful discharge] claims premised on a violation of § 4123.90 are cognizable, unless convinced that the Ohio Supreme Court would decide otherwise.  For several reasons, the Court is not convinced."  Hall, 362 F.Supp.2d at 963.[19]  The Court in Welty agreed with the rationale in Hall, concluding that a public policy claim is embodied in § 4123.90.  Welty, 2005 WL 1334923, at *8.

Moreover, plaintiff cites to an array of Ohio appellate decisions supporting the proposition that a public policy claim is embodied in § 4123.90.  See Kulch, 677 N.E.2d at 320; Limbacher v. Penn-Ohio Coal Co., No. 2001-AP-07-0065, 2002 WL 1232935, at *5 (Ohio Ct. App. May 31, 2002); Boyd v. Winton Hills Med. & Health Ctr., Inc., 727 N.E.2d 137, 145 (Ohio Ct. App. 1999); Rauhuff v. American Fan Co., No. CA98-09-188, 1999 WL 527783, at *6-7

---

[19]  In support of this conclusion, the court reasoned that § 4123.90 resembles O.R.C. § 4113.52, the Ohio whistle-blower statute, under which a public policy claim was allowed to be asserted in Kulch v. Structural Fibers, Inc., 677 N.E.2d 308, 320 (Ohio 1997). Id. at 963. Second, the court was persuaded by majority dicta in Coolidge v. Riverdale Local Sch. Dist., 797 N.E.2d 61, 70-71 (Ohio 2003). Id.  The court explained that Coolidge  "seems to recognize the very claim at issue here...." Id.  The court also relied on another unpublished Sixth Circuit opinion which "appeared to recognize a  § 4123.90 [tortious wrongful discharge] claim, rejecting it only for failure to follow procedural requirements and for lack of evidence, not because such claims are not allowed." Id. at 962; see also Covucci v. Serv. Merch. Co., No. 98-3823, 2004 WL 2367970, at *3 (6th Cir. Oct. 20, 2004).

(Ohio Ct. App. June 21, 1999); Hildebrecht v. Premier Machine Products, Inc., No. 2000-L-086, 2001 WL 1497195, at *4 (Ohio Ct.  App. November 21, 2001); Kent v. Chester Labs, Inc., 761 N.E.2d 60, 65 (Ohio Ct. App. 2001); Balyint, 480 N.E.2d at 420.  On the other hand, defendant cites to a few cases holding that a public policy claim does not exist.  See Anderson v. Lorain Cty. Title Co., 623 N.E.2d 1318, 1322 (Ohio Ct. App.1993); Burress v. Sears, Roebuck & Co., No. C-1-95-110, 1995 WL 500874, at *3 (S.D. Ohio July 18, 1995); Jakischa v. Central Parcel Express, No. 03-3976, 2004 WL 1987131, at *3  (6th Cir. Sept. 1, 2004).

Though there are conflicting opinions on this issue, the Court finds the weight of Ohio and federal authority supports the fact that a public policy is embodied in §4123.90 and that plaintiff's claim is a viable one under Ohio law.  The Court is convinced that the Ohio Supreme Court would likewise rule in the same fashion.  Accordingly, the Court denies plaintiff's motion to certify the question to the Ohio Supreme Court.

### b.  Summary Judgment Analysis

Plaintiff asserts his termination violated the public policy embodied in O.R.C. § 4123.90. Defendant moves for summary judgment on this claim.  For the following reasons, the Court denies defendant's motion on this claim.

The Ohio Supreme Court has laid out four requirements an employee must meet when bringing a Greeley claim[20] for wrongful termination in violation of public policy embodied in a statute.  The four requirements are:

---

[20] In Greeley v. Miami Valley Maint. Contractors, Inc., 551 N.E.2d 981 (Ohio 1990), the Ohio Supreme Court held "a cause of action for wrongful discharge may be brought in tort."  Id. at 987.  These types of claims are referred to as "Greeley claims."  Two years after the case was decided, Greeley was overruled in part by Tulloh v. Goodyear Atomic Corp. 584 N.E.2d 541, 545 (Ohio 1992).  However, our analysis is unaffected by Tulloh and the term "Greeley claim" continues to be used.

34

1.      That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the "clarity" element)

2.      That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the "jeopardy" element)

3.      The plaintiff's dismissal was motivated by conduct related to the public policy (the "causation" element)

4.      The employer lacked overriding legitimate business justification for the dismissal (the "overriding justification" element).

Collins v. Rizkana, 652 N.E.2d 653, 657-658 (Ohio 1995).  The first two elements are questions of law for the Court to decide, while the third and fourth elements are issues of fact to be determined by a jury.  Id. at 658.

The Court finds plaintiff has established the clarity element.  In reaching this conclusion, the Court relies on the rationale in Hildebrecht, where the court held "[t]he first element is met by the public policy contained in R.C. 4123.90, which permits the use of the workers' compensation system without reprisal."  Hildebrecht, 2001 WL 1497195, at *2; see also Rauhuff, 1999 WL 527783, at *7.  The same rationale applies in the present case.  The Court finds plaintiff has also satisfied the jeopardy element by establishing a prima facie case of retaliatory discharge under § 4123.90 which implicates the public policy cause of action.  See Hildebrecht, 2001 WL 1497195, at *2; Rauhuff, 1999 WL 527783, at *7.  In addition, "[t]he second element is also met because offering appellant (plaintiff) a full range of remedies under a public policy cause of action complements the statutory remedies of R.C. 4123.90."  Rauhuff, 1999 WL 527783, at *22 (citing Kulch v. Structural Fibers, Inc., 677 N.E.2d 308 (Ohio 1997)).  Pursuant to § 4123.90, a successful plaintiff is only entitled to reinstatement with back pay and

lost wages, while Ohio common law provides plaintiffs with a full compliment of remedies, including punitive damages and the right to a jury trial. <u>Kent</u>, 761 N.E.2d at 65; <u>see</u> <u>also</u> <u>Balyint</u>, 480 N.E.2d at 421.

Based on the foregoing analysis, and the rationale in <u>Hildebrecht</u>, <u>Rauhuff</u>, and <u>Kent</u>, the Court denies defendant's motion for summary judgment on plaintiff's claim of wrongful discharge in violation of public policy under § 4123.90.

## IV.  DISPOSITION

For all of the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part defendant's motion for summary judgment, **DENIES** plaintiff's motion to certify questions to the Ohio Supreme Court, and **DENIES** plaintiff's motion to strike the Cowan affidavit. Plaintiff's claims for retaliatory discharge and wrongful discharge in violation of public policy embodied in O.R.C. § 4123.90 remain pending.  The remaining claims are dismissed with prejudice.

The Clerk shall remove Docs. 26, 43, & 48 from the Court's pending motions list.

**IT IS SO ORDERED.**

/s/ George C. Smith
**GEORGE C. SMITH, JUDGE**
United States District Court